IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> COMMSCOPE, INC. and ) <br> ANDREW CORPORATION, ) <br> ) <br> Defendants. ) <br> ) | Case No. <br><br> JUDGE: <br><br> Deck Type:   Antitrust |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

### I. Nature and Purpose of the Proceeding

Defendants entered into an Agreement and Plan of Merger dated June 26, 2007, pursuant to which CommScope, Inc. ("CommScope") will acquire Andrew Corporation ("Andrew"). As a result of the transaction, CommScope will acquire Andrew's interests, including stock ownership, notes of indebtedness and management rights, in Andes Industries, Inc. ("Andes"). Plaintiff filed a civil antitrust Complaint on December __, 2007 seeking to enjoin the proposed acquisition. The Complaint alleges that the acquisition by CommScope of Andrew's holdings in Andes may substantially lessen competition in the market for drop cable and will create

interlocking directorates, in violation of Section 7 and Section 8 of the Clayton Act, 15 U.S.C. §§ 18, 19. This loss of competition would likely result in higher prices, reduced innovation, and fewer choices for customers.

At the same time the Complaint was filed, plaintiff also filed a Hold Separate Stipulation and Order and proposed Final Judgment, which are designed to eliminate both the anticompetitive effects of the acquisition and the interlocking directorates. Under the proposed Final Judgment, which is explained more fully below, defendants are required to divest (a) Andrew's entire ownership in Andes; (b) all notes of indebtedness in favor of Andrew by Andes; (c) all warrants to acquire additional stock of Andes; and (d) intellectual property relating to the "Z-Wire" product (collectively the "Andes Holdings"). At the same time as the required divestiture, defendants will relinquish Andrew's governance rights over Andes, including rights to appoint members of Andes' board of directors. Under the Hold Separate Stipulation and Order, defendants will take certain steps to ensure (a) that defendants do not exercise any of Andrew's management rights in Andes, except in certain narrowly defined circumstances; (b) that Andrew's current member on the Andes' board of directors will resign within two business days after CommScope acquires Andrew and Andrew will not exercise its right to appoint members to Andes' board; (c) that Andes will remain independent of and uninfluenced by defendants during the pendency of the ordered divestiture; and (d) that competition is maintained during the pendency of the ordered divestiture.

Plaintiff and defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this

action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. Description of the Events Giving Rise to the Alleged Violations

### A. The Defendants and the Proposed Transaction

Defendant CommScope is a Delaware corporation with headquarters in Hickory, North Carolina. It is a major manufacturer and provider of wire and cable products. It manufactures, among other things, drop cable and, through a wholly-owned subsidiary, hardware products used in drop cable installations. For fiscal year 2006, CommScope reported total revenues in excess of $1.6 billion, with $550 million coming from its broadband business segment, which includes cable and hardware products sold to cable television and telecommunications companies.

Defendant Andrew is a Delaware corporation with headquarters in Westchester, Illinois. Andrew is a major manufacturer and supplier of antenna and cable products and products for wireless communication systems. For fiscal year 2006, it reported total sales in excess of $2.1 billion, with approximately $1.3 billion coming from its antenna and cable business segment.

Andrew was a manufacturer of drop cable until it sold this business in March 2007 to Andes and Andes' subsidiaries, PCT International, Inc. and PCT Broadband Communications (Yantai) Co. Ltd. (collectively "Andes"). As a result of two transactions between Andrew and Andes, Andrew holds 30 percent of Andes' equity, a warrant to acquire additional stock of Andes, and several Andes' notes of indebtedness. Andrew also holds, under a March 30, 2007, Amended and Restated Investor Rights Agreement (the "IRA"), numerous governance rights over Andes, including rights to designate members of Andes' board of directors. When it sold its

3

drop cable business to Andes, Andrew licensed Andes to use the intellectual property associated with Z-Wire, a dry anti-corrosion protected drop cable.

Pursuant to an Agreement and Plan of Merger dated June 26, 2007, CommScope proposes to acquire Andrew in an all-stock transaction valued at approximately $2.6 billion. As a result of the proposed acquisition, CommScope would obtain rights to appoint members to the board of directors of Andes, a significant competitor in the development, manufacture and sale of drop cable. In addition, it would be able to exert substantial control over Andes, given its ownership of shares, warrants and debt instruments, and its governance rights. CommScope's acquisition of Andrew would thus substantially lessen competition in the market for drop cable, and would create interlocking directorates between competing companies. This acquisition is the subject of the Complaint and proposed Final Judgment filed by plaintiff.

### B. Substantial Lessening of Competition

CommScope's acquisition of Andrew's holdings in Andes would violate Section 7 of the Clayton Act because the acquisition's effect may be substantially to lessen competition in the market for drop cable in the United States.

#### 1. Relevant Product and Geographic Markets

##### a. Drop Cable Product Market

Drop cable is 75 ohm coaxial cable used by cable television companies to connect their transmission systems with their customers' premises and equipment inside the customers' premises. It consists of a plastic jacket, metal braid and foil shielding, a dielectric layer, and a center conductor. Cable television companies typically use drop cable in three kinds of locations: (1) in the air between outside poles and the exteriors of the customers' premises;

(2) underground between buried transmission systems and the exteriors of the customers' premises; and (3) inside the customers' premises to connect the exterior cables with customer-premises devices. Drop cable strung between outside poles and the exteriors of the customers' premises typically contains an ultraviolet ("UV") protectant in the jacket and a steel wire, called a "messenger," inside the cable to reduce flexing; much of this aerial cable also incorporates anti-corrosion protection for the metal shielding. Drop cable used underground typically is "flooded" with a gel compound to prevent water ingress and corrosion.

No matter how it is used, all drop cable purchased by cable television companies is distinguished from other 75 ohm coaxial cable, which is usually called "commodity" cable. Drop cable must meet stringent Society of Cable Television Engineers ("SCTE") and other cable television industry standards. Those standards address, inter alia, durability, uniformity, electrical conduction and signal shielding. Signal shielding standards address the ability of the cable to prevent signal leakage outside the cable, as well as leakage into the cable of extraneous outside signals. Compliance with SCTE and other industry standards assures cable television companies that the drop cable they buy will not require frequent replacement, will fit with the other components of their systems, can readily be handled by a cable system's installers and technicians, and, most importantly, will deliver a strong and interference-free signal.

In addition to the above requirements, some cable television customers require that dry anti-corrosion protection be incorporated into much of the drop cable they buy. Anti-corrosion protection protects the cable's shielding from oxidation, which can result in interference and diminished signal strength. Two types of anti-corrosion coatings are used, gel and dry. Gel coated cables are used for almost all underground installations. A few cable television

companies also use them for aerial installations. Many cable television companies require dry-coated cable for all aerial installations. They impose this requirement because dry cable is easier to work with, does not drip from cables onto hardware or customers' property, and costs less. The demand for dry anti-corrosion is especially strong among cable television companies that operate near the ocean or in other areas prone to metal oxidation.

Drop cable is the relevant product market, or "line of commerce," within the meaning of Section 7 of the Clayton Act. Cable television companies, who are the purchasers of drop cable, could not use other types of coaxial cable. Those alternatives do not meet industry standards and could fail to provide the strong and interference-free signal that consumers expect. Because other types of coaxial cable would degrade the performance of their networks, causing cable subscriber dissatisfaction, cable television companies would not switch from drop cable to other types of cable even if faced with a significant price increase.

### b. The United States Geographic Market

The United States is a distinct geographic market for the sale of drop cable. SCTE and cable televison industry standards are designed to meet the common needs of cable television companies operating in the United States. Although Andes and CommScope manufacture drop cable in China for sale in the United States, no foreign companies make drop cable that conforms to SCTE and United States cable television industry standards, and no foreign companies sell drop cable to cable television companies in the United States.

In addition, cable television companies in the United States require their suppliers to have a substantial presence within the United States, including distribution facilities and service infrastructures. No foreign company maintains such a presence for drop cable in the United

States. Therefore, a small but significant increase in the price of drop cable would not cause cable television companies in the United States to substitute purchases from companies who operate outside the United States in sufficient quantities so as to make such a price increase unprofitable. Accordingly, the United States is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

### 2. Competitive Effects of the Transaction

#### a. Anticompetitive Effects

CommScope's acquisition of Andrew's interests in Andes would substantially lessen competition in the market for drop cable in the United States. The market for drop cable is already highly concentrated. Only four companies provide drop cable to cable television companies in the United States. CommScope is the leading manufacturer by a large margin, with a market share of between 60 and 70 percent. Andes is the third largest manufacturer, with about a four percent market share. Andes is having a significant impact in the market because of its lower pricing and ability to offer drop cable with dry anti-corrosion protection.

The full line of products offered by CommScope and Andes make them each other's closest competitors for many customers. Of the four manufacturers, only CommScope and Andes offer drop cable with dry anti-corrosion protection. The processes by which both firms apply the dry chemical coating to the cable's shielding are protected by patent. Many cable television firms need or prefer the dry anti-corrosion protection offered by products in this category, CommScope's Brightwire or Andes' Z-Wire.

Competition between Andes and CommScope in the sale of drop cable has benefitted consumers. The prices charged by Andrew and Andes generally have been five to ten percent

lower than those charged by CommScope and the other manufacturers. Those lower prices have served as constraints on CommScope's own pricing. Since Andrew's first significant sales several years ago, its market share, and later Andes' market share, have steadily increased, as a greater number of cable television firms have approved their products for purchase.

Andes and CommScope also compete with each other in product innovation. CommScope developed the first dry anti-corrosion protected drop cable product, Brightwire. Andrew developed Z-Wire specifically to compete for sales that would otherwise have gone to Brightwire. Andes and CommScope have continued to engage in efforts to develop new technology.

If CommScope were allowed to acquire Andrew's holdings in Andes, Andes would no longer be an independent drop cable competitor. CommScope's substantial ownership in Andes would reduce its incentive to compete with Andes. In addition, under the IRA, CommScope would obtain substantial governance rights over Andes. Once CommScope completes its acquisition of Andrew, Andes' board of directors will have seven members. CommScope will then have rights to appoint two members of that board, and jointly with another Andes' shareholder, to appoint two more. In addition, CommScope's consent will be required under the IRA for a range of corporate actions by Andes, and CommScope will hold extensive rights to access Andes' confidential business information. These governance rights, combined with its 30 percent ownership stake and other interests in Andes, would give CommScope both the incentive and the ability to coordinate its activities with those of Andes, and/or to undermine Andes' ability to compete on price and innovation.

### b. Entry

Successful entry into the drop cable market would not be timely, likely or sufficient to offset the anticompetitive effects resulting from this transaction. The drop cable industry has been characterized by firms exiting and failed entry attempts. Andrew itself began the process of entering the market in 1997, and only now, ten years later, has its successor, Andes, achieved a four percent market share.

Timely entry sufficient to replace the market impact of Andes would be difficult for several reasons. Any new manufacturer would have to develop a product line and set up a manufacturing facility, submit sample products for the extensive laboratory and field tests required by all substantial cable television firms, and then undergo the lengthy process of attempting to sell the products to those companies. Andes' success is due in part to its ability to offer a full line of drop cable products. A new entrant could not duplicate that success unless it could offer drop cable with dry anti-corrosion protection. The Brightwire and Z-Wire products are both protected by patent. Development of a new process which does not infringe on those patents would likely be time-consuming and difficult.

## C. Interlocking Directorates

CommScope and Andes compete in the manufacture and sale of both drop cable and hardware products used in drop cable installations. Each company and each company's sales of competing products meet all the threshold tests of Section 8 of the Clayton Act. Following the acquisition, as initially structured, CommScope would have the right under the IRA to appoint two members of Andes' seven member board of directors, who would act as its agents on the Andes board. In addition, CommScope would have the right to select, jointly with another

Andes shareholder, two more members of the Andes board. CommScope, a person within the meaning of Section 8, also nominates the members of its own board of directors. Thus, CommScope's participation through its representatives on both its own board of directors and Andes' board of directors would create interlocking directorates in violation of Section 8.

### III. Explanation of the Proposed Final Judgment

The proposed Final Judgment will eliminate both the anticompetitive effects that would result from CommScope's acquisition of Andrew's holdings in Andes, and CommScope's ability to appoint members of Andes' board of directors. With respect to Section 7, the proposed Final Judgment requires defendants, within 90 days after the filing of the Complaint, or five days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest the Andes Holdings, including Andrew's entire ownership interest in Andes, the intellectual property concerning the Z-Wire product, as well as all notes of indebtedness in favor of Andrew by Andes and warrants to acquire additional stock of Andes. These holdings must be divested to an acquirer that in the United States' sole judgment has the intent and capability of investing in Andes in such a manner as to support the continued competitive operations of its drop cable business. Defendants must take all reasonable steps necessary to accomplish the divestiture quickly and shall cooperate with prospective acquirers. With respect to Section 8, defendants, under the proposed Final Judgment, would no longer have any rights under the IRA, including the rights to appoint members of Andes' board.

Although Andes holds a license from Andrew for the Z-Wire intellectual property, the proposed Final Judgment requires the defendants to divest that intellectual property, subject to

Andes' continuing license, to the acquirer. This divestiture will ensure that CommScope does not gain control over a technology that is vital to Andes' ability to compete.

### A. Timing of Divestiture

In antitrust cases involving mergers or joint ventures in which the United States seeks a divestiture remedy, it requires completion of the divestiture within the shortest time period reasonable under the circumstances. The proposed Final Judgment in this case requires, in Section IV(A), divestiture of the Andes Holdings within 90 days after the filing of the Complaint, or five days after notice of the entry of the Final Judgment by the Court, whichever is later. Plaintiff in its sole discretion may extend the time period for divestiture by up to 60 days.

In this matter the proposed Final Judgment also provides for an additional extension in certain circumstances. This extension will preserve the abilities of Andes and another Andes shareholder to exercise their rights of first refusal under the IRA. If the defendants find an acquirer approved by plaintiff within the initial period for divestiture, and an agreement with the acquirer has been reached and approved by the plaintiff, and defendants have given written notice of their intent to sell as required by the IRA, the time for completing the divestiture will automatically be extended in order to allow defendants to comply with the IRA's right of first refusal provision. The period of this extension may not exceed five days past the last date on which the right of first refusal provision continues to be applicable.

The divestiture timing provisions of the proposed Final Judgment will ensure that the divestiture are carried out in a timely manner, and at the same time will permit defendants an adequate opportunity to accomplish the divestiture consistent with their obligations under the IRA. Even if the Andes Holdings have not been divested upon consummation of the transaction, there

should be no adverse impact on competition given the limited duration of the period of common ownership and the detailed requirements of the Hold Separate Stipulation and Order.

**B. Use of a Trustee**

In the event that the defendants do not accomplish the divestiture within the periods prescribed in the proposed Final Judgment, the Final Judgment provides that the Court will appoint a trustee selected by plaintiff to effect the divestiture. As part of this divestiture, defendants must relinquish any direct or indirect financial ownership interests and any direct or indirect role in management or participation in control of Andes Holdings.

Section V details the requirements for the establishment of the divestiture trust, the selection and compensation of the trustee, and the responsibilities of the trustee in connection with the divestiture. The trustee will have the sole responsibility, under Section V(B), for the divestiture of the Andes Holdings. The trustee has the authority to accomplish the divestiture at the earliest possible time and "at such price and on such terms as are then obtainable upon reasonable effort by the trustee."

The proposed Final Judgment provides that defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured, under Section V(D) of the proposed Final Judgment, so as to provide an incentive for the trustee based on the price and terms obtained and the speed with which the divestiture is accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and plaintiff setting forth his or her efforts to accomplish the divestiture. At the end of six months, if the divestiture has not been accomplished, the trustee and plaintiff will make recommendations to the Court, which shall enter such orders as

appropriate in order to carry out the purpose of the Final Judgment, including extending the trust or term of the trustee's appointment.

### C. The Hold Separate Stipulation and Order

The Hold Separate Stipulation and Order, filed at the same time as the Complaint, ensures that, pending divestiture of the Andes Holdings, defendants will take no steps to limit Andes' ability to operate as a competitively independent, economically viable, and ongoing business concern, that defendants do not influence Andes' business, and that competition is maintained. The Hold Separate Stipulation and Order bars the defendants from:

1. voting or permitting to be voted any Andes shares that defendants own, or using or attempting to use any ownership interest in Andes to exert any influence over Andes, except as necessary to carry out defendants' obligations under the Hold Separate Stipulation and Order and the Final Judgment;

2. electing, nominating, appointing or otherwise designating or participating as officers or directors;

3. participating in any meetings or committees of the Andes Board of Directors;

4. communicating to or receiving from any officer, director, manager, employee, or agent of Andes any nonpublic information regarding any aspect of Andes' business, except the information specified in Sections V(A) and V(B) of the Hold Separate Stipulation and Order and Sections IV(C) and VIII(B) of the proposed Final Judgment; and

5. exercising certain governance rights under the IRA except as specified in Section V(B) of the Hold Separate Stipulation and Order.

In addition, the Hold Separate Stipulation and Order requires Andrew's current representative on Andes' board to resign and bars defendants from acquiring any additional shares of Andes except as specified in Section V(D) of the Hold Separate Stipulation and Order. It also requires defendants to continue to provide Andes certain support services until the end of February 2008.

## IV. Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against defendants.

## V. Procedures Available for Modification of the Proposed Final Judgment

Plaintiff and defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that plaintiff has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to plaintiff written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register or the last date of publication in a newspaper of the summary of this Competitive Impact

14

Statement; whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of plaintiff will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Nancy M. Goodman
> Chief, Telecommunications and Media Enforcement Section
> Antitrust Division, U.S. Department of Justice
> 1401 H Street, N.W., Suite 8000
> Washington, DC  20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. Alternatives to the Proposed Final Judgment

Plaintiff considered, as an alternative to the proposed Final Judgment, a full trial on the merits against defendants. Plaintiff could have continued the litigation and sought preliminary and permanent injunctions against CommScope's acquisition of Andrew. Plaintiff is satisfied, however, that the divestiture of the Andes Holdings described in the proposed Final Judgment will eliminate the possibility of interlocking directorates and preserve competition in the development, manufacture and sale of drop cable in the relevant market identified in the Complaint. Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

15

## VII. Standard of Review Under the APPA for the Proposed Final Judgment

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A)  the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B)  the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one, as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[1]

---

[1] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001). Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."* More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461

---

[2] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

17

(noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As

this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[3]

---

[3] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973)("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.").

## VIII. Determinative Documents

There are no determinative materials or documents within the meaning of the APPA that were considered by plaintiff United States in formulating the proposed Final Judgment.

Dated: December 6, 2007

Respectfully submitted,

Alvin H. Chu
Michael Hirrel (DC Bar No. 940353)
Brent Marshall
Peter Gray
Attorneys, Telecommunications & Media
Enforcement Section
Antitrust Division
U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530
(202) 514-5621
Facsimile: (202) 514-6381